IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

**CRYSTAL ELIZABETH FEE,**                              Case No. 3:16 CV 2570

       Plaintiff,

       v.                                             Magistrate Judge James R. Knepp, II

**COMMISSIONER OF SOCIAL SECURITY,**

       Defendant.                                     MEMORANDUM OPINION AND ORDER

## INTRODUCTION

Plaintiff Crystal Elizabeth Fee ("Plaintiff") filed a Complaint against the Commissioner of Social Security ("Commissioner") seeking judicial review of the Commissioner's decision to deny child's insurance benefits ("CIB") and supplemental security income ("SSI"). (Doc. 1). The district court has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g). The parties consented to the undersigned's exercise of jurisdiction in accordance with 28 U.S.C. § 636(c) and Civil Rule 73. (Doc. 13). For the reasons stated below, the undersigned affirms the decision of the Commissioner.

## PROCEDURAL BACKGROUND

Plaintiff filed for CIB and SSI in January 2014, alleging a disability onset date of January 8, 2014. (Tr. 238, 244). Her claims were denied initially and upon reconsideration. (Tr. 169, 172, 176, 179). Plaintiff then requested a hearing before an administrative law judge ("ALJ"). (Tr. 185). Plaintiff (represented by a non-attorney representative), and a vocational expert ("VE") testified at a hearing before the ALJ on July 13, 2015. (Tr. 81-113). On August 4, 2015, the ALJ found Plaintiff not disabled in a written decision. (Tr. 64-75). The Appeals Council denied Plaintiff's request for review, making the hearing decision the final decision of the Commissioner. (Tr. 1-7);

*see* 20 C.F.R. §§ 416.1455, 416.1481. Plaintiff timely filed the instant action on October 21, 2016. (Doc. 1).

**FACTUAL BACKGROUND**

Personal Background and Testimony

Plaintiff was born in November 1992, making her 21 years old at her alleged onset date. *See* Tr. 238. She had completed high school, and some cosmetology training. (Tr. 263). She had past part-time work in 2009 and 2010 as a fast food worker and restaurant hostess. (Tr. 263, 316). At the time of the hearing, Plaintiff lived with, and was supported by her grandmother. (Tr. 87). She had a driver's license and drove about three times per week. *Id.*; Tr. 91.

Plaintiff testified she was under the care of Dr. Morrow, who told her she had "a progressive rheumatoid arthritis". (Tr. 89). She was undergoing monthly Orencia infusions, and taking medication. (Tr. 89-90). After the infusions, Plaintiff was "usually pretty tired" and "[s]ometimes [she] fe[lt] better, and sometimes [she] fe[lt] worse." (Tr. 90).

Plaintiff testified she had three to four "bad days" per week, in which she was "very fatigued" and had "lots of pain . . . throughout [her] body". (Tr. 92). Plaintiff testified to trouble with her wrists; specifically, she had difficulty with tasks such as opening jars, getting the gas cap off her car, and opening doors. (Tr. 90-91). She estimated she could type on a computer for "about an hour" before needing a fifteen-minute break. (Tr. 91). She similarly had difficulty with writing. (Tr. 92). Plaintiff also testified to problems with things like buttons, snaps, and zippers; she also had difficulty brushing and washing her hair, and putting shirts on. (Tr. 95). Reaching caused her elbows to hurt. (Tr. 96).

Plaintiff had trouble walking due to her knee pain. (Tr. 92). Plaintiff's right knee was worse, and it hurt if she sat for too long or stood in one place. *Id.* Plaintiff experienced swelling

in her knees, ankles, and sometimes her hands. (Tr. 93). She testified she elevated her legs once or twice per day for fifteen to twenty minutes. *Id.*

If she was "constantly moving", Plaintiff estimated she could stand for 40 minutes, but only about ten minutes if she had to stand in one place. (Tr. 92). Plaintiff estimated she could sit for about an hour before having to move around due to back pain. (Tr. 93). She estimated she could walk around the block before needing a break for about ten minutes; then she could walk around the block again. (Tr. 93-94). On a good day, she could do this every hour, but not on a bad day. (Tr. 94). Plaintiff testified she had a hard time going down stairs, needed to use a hand rail, and used a wheelchair if she had to travel more than a block. *Id.* Plaintiff estimated she could lift three pounds on a regular basis, due to problems with her hands. (Tr. 95). She testified she was unable to squat down and get back up, or kneel. (Tr. 97).

Plaintiff grocery shopped with her grandmother; it usually took about 40 minutes. (Tr. 94). Her grandmother helped with the heavy things. (Tr. 95). She also did chores such as dishes and laundry. (Tr. 96). She would have to take breaks after, however, due to her hands, feet, and back starting to hurt, as well as fatigue. *Id.* Plaintiff could also sweep with a broom. (Tr. 97).

Plaintiff testified to doing some vocational training. (Tr. 88, 98-99, 100-01). During this training, she went to school for four hours each day, two days per week from January to May and then would go home and take a nap. (Tr. 98-100). She obtained certifications in Microsoft and Excel. (Tr. 88, 100-01).

Plaintiff testified she saw a surgeon regarding her wrists and the progression of the arthritis. (Tr. 99-100). He told her she would "need surgery probably in the future", but she "decided to just wait a while for that surgery." *Id.* She said the surgeon told her "in the future, [she could] come back and see him whenever." (Tr. 101).

Plaintiff's mother also testified at the hearing. (Tr. 102-07). She saw Plaintiff two to three times per week. (Tr. 103). She testified Plaintiff's ability to walk had changed within the past two years; Plaintiff walked "slower" and she was "bent over". *Id.* She stated Plaintiff had used the wheelchair to travel long distances for "about four years." (Tr. 104). She had driven Plaintiff to the hearing, which took about an hour and 20 minutes. (Tr. 105). They had stopped twice, once for breakfast, and once at the grocery store to use the restroom and for Plaintiff to stretch her legs. *Id.*

Plaintiff's mother testified Plaintiff can lift and pour a gallon of milk, but uses two hands, not one; however, she needed someone else to open the cap. (Tr. 105-06). She reported Plaintiff had gone to school "for a semester in [the] fall" but "she got to where her wrist was hurting so bad so she couldn't write." (Tr. 106).

Plaintiff's mother testified a surgeon told Plaintiff her wrist was bad because "she took . . . [Prednisone] so long that the bones are decaying in her wrist" and that she needed the surgery "right now" and to stop the Prednisone. (Tr. 106-07).

Relevant Medical Evidence[1]

*Prior to Alleged Onset Date*

By August 2011, Plaintiff had been diagnosed with arthritis. *See* Tr. 391. In November 2011, she saw nurse practitioner Julie Lehrer for an infected toe; she had her toenail removed. (Tr. 383, 386). In February 2012, Ms. Lehrer noted Plaintiff's rheumatoid arthritis (which she described as "moderate-severe"), noted Plaintiff's toe problem, and that the "problem [was] improving". (Tr.

---

1. Plaintiff challenges only the ALJ's assessment of her physical impairments. *See* Doc. 15, at 3-4 ("This brief will focus on Ms. Fee's physical impairment."). Issues not raised in a claimant's opening brief are waived. *See Kennedy v. Comm'r of Soc. Sec.*, 87 F. App'x 464, 466 (6th Cir. 2003). As such, the undersigned summarizes only the relevant records.

380). Ms. Lehrer assessed abnormal weight loss, acute polyarticular juvenile rheumatoid arthritis, chest pain, paronychia, and tinea pedis. (Tr. 381).

X-Rays in February 2012 showed inflammatory arthritis in Plaintiff's hands, feet, and right knee. (Tr. 617, 619, 621). Plaintiff's "right hand [was] more severely affected compared to the right." (Tr. 619). The knee x-ray also showed "significant periarticular osteopenia." (Tr. 617).

In March 2012, Plaintiff returned to Ms. Lehrer, and reported she was seeing Dr. Springer who had "started her on prednisone". (Tr. 378). An examination of Plaintiff's extremities was normal. (Tr. 379). Ms. Lehrer again assessed rheumatoid arthritis, and instructed Plaintiff to follow up with the Cleveland Clinic, and return in six months. *Id.* She also prescribed a handicap placard that was good for five years. *Id.*

Plaintiff underwent chiropractic treatment from February to August 2013 at Sandusky Medical and Wellness Center. (Tr. 350-74). In February, Plaintiff reported "left cervical dorsal, upper thoracic, right cervical dorsal, right cervical, cervical, left cervical, left sacroiliac, right sacroiliac, right lumbar, left lumbar, lumbar, sacral and left anterior knee discomfort" at a pain level of 9/10 and noticeable "approximately 90% of the time." (Tr. 350). She reported that "the symptoms have generally been better" since onset and that the pain was aggravated by movement. *Id.* At subsequent visits, Plaintiff reported pain levels varying from 5/10 to 10/10, with a general downward trend over time. *See* Tr. 350-74. The providers also noted that Plaintiff's pain was diminished from 35% to 85% by massage (with the most frequent notations being 70-75%). *See id.*

In April 2013, Plaintiff saw Jason Springer, M.D., for her inflammatory arthritis. (Tr. 323-27). Dr. Springer noted Plaintiff had first been seen in his clinic in March 2012. (Tr. 323). He noted

Plaintiff reported "that she continues to have stiffness in the mornings primarily in the legs" and "[t]he stiffness will last for a couple hours", but "[t]he rest of the day she does well". *Id.* Plaintiff also reported knee and ankle swelling. *Id.* On examination, Dr. Springer found unchanged limitation of flexion in the right hand, no synovitis in the hands, normal pain-free range of motion in elbows, shoulders, and hips; but bilateral effusion of both knees and the left ankle. (Tr. 324). Dr. Springer noted Plaintiff still had signs of active disease, increased Plaintiff's Methotrexate dosage, and continued her on Prednisone. *Id.*

In July 2013, Plaintiff saw Elizabeth S. Kirchner, CNP, for a follow-up appointment. (Tr. 328-34). Plaintiff reported continual swelling and pain in her left knee, and that her wrists, ankles, and feet were sore, but not swollen. (Tr. 328). Ms. Kirchner noted the same physical findings as had Dr. Springer. (Tr. 329). That same month, Plaintiff underwent two infusions of Rituxan. (Tr. 330-31, 334-35, 339, 341-42). Plaintiff reported some improvement after the infusions, but Ms. Kirchner explained this was likely due to the IV steroids, and explained Plaintiff would not see the full benefit of the infusion for six to eight weeks. (Tr. 339).[2]

*After Alleged Onset Date*

In February 2014, Plaintiff underwent a consultative psychological examination at the request of the state agency. (Tr. 412-18).[3] Plaintiff reported having been diagnosed with juvenile arthritis at age 3, with remission until her senior year of high school. (Tr. 412). "With treatment, that's improved a little bit" and it was worse in the mornings and with weather changes. *Id.* Plaintiff

---

2. Plaintiff later reported she stopped the infusions in July 2013 because she lost her insurance. *See* Tr. 413 ("She received Rituxan injections in July of 2013 but had to discontinue her treatment since she no longer has any health insurance. [T]hey are supposed to last 6 months.").
3. Because Plaintiff does not challenge the ALJ's findings regarding her mental limitations, the undersigned summarizes this opinion only to the extent it reflects on Plaintiff's physical impairments.

reported the ability to do household chores "such as dishes and laundry", but did them "at [her] pace" and would "sit down and do stuff". (Tr. 414). The psychologist noted Plaintiff "had a difficult time walking due to her [a]rthritis" and "walked very slowly with a slight limp". *Id.*

In July 2014, Plaintiff saw Matthew Widmer, D.O., to establish care, as she had recently obtained insurance. (Tr. 438). Plaintiff reported medications of Prednisone and Advil. *Id.* She had weaned down her Prednisone dosage in February, but the joint pain had returned at the beginning of April. *Id.* She had pain in her neck, shoulders, feet, wrists, hips, and elbows. *Id.* Dr. Widmer noted Plaintiff was "[g]eneral[ly] able to do usual activities" and in a "good general state of health." (Tr. 439). On examination, he noted normal joint range of motion, muscle strength was 4/5 in Plaintiff's arms and legs, and that there was "no deviation of MCP joints or deformities." *Id.* He assessed rheumatoid arthritis, referred Plaintiff to a local rheumatologist, and instructed her to follow up in six months. (Tr. 439-40).

Also in July 2014, Plaintiff underwent a two-day vocational assessment with Goodwill Industries of Northwest Ohio. (Tr. 650-51). The evaluator noted no specific vocational goals were identified "due to continued uncertainty regarding [Plaintiff's] ability to physically sustain competitive employment of any kind." (Tr. 651). It was noted that Plaintiff was "limited to 'Sedentary' to 'Light' employment as defined by the Department of Labor" and "[t]hus she appear[ed] limited to clerical related positions in which she is able to alternate sitting and standing on an as needed basis." *Id.*

Plaintiff also underwent five chiropractic treatments in July 2014. (Tr. 433).

In November 2014, Plaintiff saw Matt Morrow, M.D., at Sandusky Orthopedics and Rheumatology. (Tr. 466-67). He noted multiple previous medications had failed, and that Rituxan was too expensive and the infusions took too long. (Tr. 466). He also noted synovitis in Plaintiff's

fingers, wrists, knees, and elbows. *Id.* He advised Plaintiff to discontinue Advil, continue Prednisone, and add Tramadol and "Leflu". (Tr. 467). He also noted to "get Orencia". *Id.*

That same month in a counseling session, Plaintiff reported her arthritis treatment was helping. (Tr. 475).

Plaintiff also underwent a physical therapy evaluation in November 2014 due to neck and low back pain "with decreased mobility." (Tr. 585). Plaintiff had poor posture, abnormal gait, decreased range of motion, decreased core strength and tenderness to palpation. *Id.* The evaluation listed six long term goals: ability to demonstrate correct posture during activities, decreased pain to 0 on "FACES scale", gait with no deviation or antalgic pattern, active range of motion and strength within functional limits to allow completion of daily activities without pain, no palpable tenderness, and independence with a home exercise program. *Id.*

Plaintiff returned to Dr. Morrow in December 2014, reporting body aches and weakness. (Tr. 463). She was taking Leflunomide, Orencia, Prednisone, and Tramadol. *Id.* On examination, Plaintiff had a normal gait, and full range of motion in her shoulders, elbows, wrists, and hands. (Tr. 464). Dr. Morrow noted Heberden's nodes and Bouchard's nodes in the fingers bilaterally, as well as crepitus of the knees. *Id.* Her motor strength in her legs and arms was "intact". *Id.* Dr. Morrow assessed active rheumatoid arthritis, and instructed Plaintiff to start Orencia and continue Leflunomide. *Id.* Plaintiff's "disease and pain [were] mostly well controlled", her "medications [were] tolerated well" and Dr. Morrow advised she should "continue current medications and home exercise". (Tr. 465) (capitalization altered).

Plaintiff returned to Goodwill Industries of Northern Ohio in early December 2014. (Tr. 655-58). She underwent a Word, Excel, and keyboarding training. (Tr. 657). In the summary and recommendation portion of the evaluation, the evaluator noted:

Ms. Fee was scheduled for one more week of computer training to finish Word and Excel 2010. . . . Ms. Fee arrived on time every schedule day and seemed motivated to finish her training. As reported by Ms. Fee, stamina has increased, and she does not have any major pain or fatigue which would prevent her from finishing assigned tasks, which suggests further improvement may be possible. From staff's observations, Ms. Fee has the aptitude to succeed in some type of clerical field in a small office environment if given the opportunity to gain more on the job experience. The only unknown is if stamina and manageable pain level can be sustained long term.

(Tr. 657-58).

In February 2015, Plaintiff returned to Dr. Morrow reporting back pain, joint pain, morning stiffness, swelling, and joint swelling. (Tr. 460). On examination, Dr. Morrow again noted Heberden's nodes and Bouchard's nodes of the fingers bilaterally and knee crepitus, but normal range of motion in the shoulders, elbows, wrists, and knees. (Tr. 461). Dr. Morrow noted Plaintiff should continue medications and that she had some improvement on Orencia. *Id.* He again repeated that her "disease and pain [were] mostly well controlled", "medications [were] tolerated well", and she should "continue current medications and home exercise." (Tr. 462).

In March 2015, Plaintiff saw ER provider Amy Ramey, P.A., reporting right eye irritation that she believed was a reaction to her infusions. (Tr. 441). On examination, Ms. Ramey noted full range of motion in all extremities and no motor or sensory deficits. (Tr. 442). She assessed a corneal abrasion, referred Plaintiff to an ophthalmologist, and discharged her. (Tr. 443). Two days later, Plaintiff saw Dr. Widmer to follow up. (Tr. 436). Plaintiff reported she was told her medication could cause eye irritation, but had not reported it to her rheumatologist. *Id.* Dr. Widmer saw no corneal abrasion, and instructed Plaintiff to contact Dr. Morrow. (Tr. 437).

That same month, Dr. Morrow noted erythema in the right eye, with photophobia. (Tr. 457). He suspected inflammation rather than infection. (Tr. 459). Dr. Morrow noted similar

physical findings as before (Tr. 458), and made similar comments (Tr. 459). He increased Plaintiff's Prednisone dosage. (Tr. 458).

Plaintiff returned to Dr. Morrow in April 2015. (Tr. 646-68). Her eyes were clear. (Tr. 646). Dr. Morrow noted similar physical findings as before (Tr. 647) as well as made similar comments about Plaintiff's disease and pain being "mostly well controlled" (Tr. 648). He advised Plaintiff to decrease Prednisone. (Tr. 647-48).

Plaintiff also saw Michael Keith, M.D., in April 2015 regarding her right wrist and bilateral thumb pain. (Tr. 600-01). A right wrist x-ray showed "periarticular osteopenia" and "suggest[ed] chronic inflammatory arthritis". (Tr. 594, 600). Dr. Keith noted that based on x–ray findings and pain in joints on examination, Plaintiff would be a candidate for surgery. (Tr. 601). The surgery, however, would be dependent upon reducing her Prednisone dosage. *Id.*

Throughout this time period—from the initial evaluation in November 2014 through April 2015—Plaintiff attended regular physical therapy sessions. *See* Tr. 519-85. Notes indicate Plaintiff tolerated the treatment well, showed improvement, increased strength, and progress toward her goals. *See id.* Notes also consistently indicate aggravating factors of: sitting, standing, walking, going up or down stairs, sitting to standing, bending, and lying down. *See id.* At the final visit in April 2015, Plaintiff was noted to have: made 90% progress toward her goal of being able to demonstrate correct posture during activities; made 75% progress toward decreased pain to 0 "on FACES scale"; 85% progress toward gait with no deviation or antalgic pattern; 50% progress toward active range of motion and strength within functional limits to allow daily activity completion without pain; 85% progress toward no palpable tenderness; and 80% progress toward independence with a home exercise program. (Tr. 519).

In June 2015, Plaintiff returned to Dr. Morrow complaining of aches and pains. (Tr. 641). She reported feeling weak, but denied fatigue. *Id.* Dr. Morrow noted synovitis bilaterally in Plaintiff's wrists and fingers, and crepitus of both knees. (Tr. 642). She had a normal gait, and full range of motion in her shoulders, elbows, wrists, fingers, hips, and knees. *Id.* Her motor strength was "intact". *Id.* Dr. Morrow noted Plaintiff had some improvement on Orencia but her disease was still active. *Id.* He increased her Leflunomide dosage and noted she should try to decrease Prednisone. (Tr. 643-43).

*Opinion Evidence*

In March 2014, Kevin Smith, M.D., performed a consultative examination at the request of the state agency. (Tr. 421-24). Plaintiff reported rheumatoid arthritis affecting "her knees[,] hands[,] and elbows principally", but with discomfort in all joints. (Tr. 421). She stated the pain was constant and 7/10. *Id.* She reported morning stiffness, and increased pain with increased activity, as well as decreased grip strength bilaterally. *Id.* Dr. Smith noted Plaintiff had "findings of joint deformity in the hands and knees and generalize[d] muscle weakness and with apparent muscle atrophy in the hands". *Id.* On examination, Dr. Smith noted a normal gait, and normal range of motion in Plaintiff's cervical and lumbar spine, shoulder, elbows, wrists, ankles, toes, knees, and hips. (Tr. 422-24). She had "poor grip due to muscle atrophy in the hands and joint deformity". (Tr. 423). She had "generalized weakness, but [could] against resistance, abduct shoulder, flex elbow, extend wrist, flex wrist, extend elbow and grip, bilaterally", although her "[g]rip strength [was] reduced equal[ly] bilaterally". (Tr. 424). Plaintiff had decreased strength against resistance her "hip abductors, foot dori and plantar flexors, as well as evertors and invertors, bilaterally". *Id.* Plaintiff was able to heel and toe walk, and to squat and rise from a squatting position "without discomfort". *Id.* Manual muscle testing showed 4/5 strength throughout. (Tr. 426). Plaintiff's

ability to grasp, manipulate, pinch, and perform fine coordination was noted to be "normal". *Id.* Plaintiff had normal range of motion "in all areas, however there is notable joint deformity at the knees and hands/wrists; with associated muscle weakness and some muscle atrophy in the hands." (Tr. 429). Dr. Smith assessed rheumatoid arthritis, and opined Plaintiff could "likely perform a sedentary level work", but "due to findings of generalized muscle weakness and joint deformity, limiting repetitive, prolonged, and static postures and activities should be considered". (Tr. 425).

In April 2014, Abraham Mikalov, M.D., reviewed Plaintiff's records and opined Plaintiff could perform the physical requirements of medium work, with frequent stooping, kneeling, crouching, crawling, and climbing ramps and stairs; and occasional climbing of ladders, ropes, and scaffolds; Plaintiff was also limited to frequent bilateral handling and fingering. (Tr. 121-23). In May 2014, William Bolz, M.D., reviewed Plaintiff's records and concluded Plaintiff could perform the physical requirements of light work with the same postural and manipulative limitations. (Tr. 147-49).

In January 2015, Dr. Morrow completed a form stating Plaintiff could perform "[n]o work" and commenting: "Because of the patient's rheumatoid arthritis she is unable to work." (Tr. 624) (capitalization altered). For the "[e]xpected [l]ength of [d]isability", Dr. Morrow indicated "weeks". *Id*

VE Testimony

A VE also appeared and testified at the hearing before the ALJ. (Tr. 107-11). The ALJ asked the VE to assume a hypothetical individual of Plaintiff's age and education level, who could perform the full range of light work, who must be able to sit, stand, or walk at will, but who would not be off task more than 10% of the day. (Tr. 109). Such an individual could frequently climb ramps and stairs, as well as handle and finger with both hands. *Id.* She could occasionally climb

ladders, ramps and stairs; as well as balance, stoop, crouch, kneel, and crawl. *Id.*[4] The VE testified such an individual could perform jobs of office helper, wire cutter, or assembler (with assembler being a sedentary, rather than light, exertional job). (Tr. 109-10).

In her second hypothetical question, the ALJ asked the VE to assume the same hypothetical individual, but limited to only occasional handling and fingering with both hands. (Tr. 110). The VE testified such an individual would not be able to obtain full time competitive employment. *Id.*

In her third hypothetical question, the ALJ asked the VE to assume an individual who could perform a full range of sedentary work, but who was otherwise limited as described in the first hypothetical. *Id.* The VE testified such an individual could perform work as an assembler, final assembler, or sorter. (Tr. 110-11).

ALJ Decision

In his August 2015 written decision, the ALJ found Plaintiff had not yet attained age 22 nor engaged in substantial gainful activity since her alleged onset date. (Tr. 66). The ALJ found Plaintiff had severe impairments of depressive disorder not otherwise specified, and inflammatory arthritis, but that these impairments did not meet or equal the severity of one of the listed impairments either singly or in combination. (Tr. 66-67). He then concluded Plaintiff retained the RFC:

> to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except she must be allowed to sit or stand at will, or sit and walk at will provided, however, that she is not off task more than 10% of the work period. She can frequently climb ramps and stairs, and can occasionally climb ladders, ropes, and scaffolds. She can occasionally balance, stoop, crouch, and kneel, and can frequently handle and finger with both hands.

---

4. The hypothetical question also included mental limitations not at issue here. *See* Tr. 109.

(Tr. 68).[5] The ALJ then found, based on the testimony from the VE, that there were jobs existing in significant numbers in the national economy that Plaintiff could perform, and, therefore, she was not disabled. (Tr. 74-75).

## STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

## STANDARD FOR DISABILITY

Eligibility for benefits is predicated on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.1505(a) & 416.905(a); *see also* 42 U.S.C. § 1382c(a)(3)(A).

---

5. The RFC determination also included mental limitations which are not at issue here. *See* Tr. 68.

The Commissioner follows a five-step evaluation process—found at 20 C.F.R. §§ 404.1520 and 416.920—to determine if a claimant is disabled:

1. Was claimant engaged in a substantial gainful activity?

2. Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3. Does the severe impairment meet one of the listed impairments?

4. What is claimant's residual functional capacity and can claimant perform past relevant work?

5. Can claimant do any other work considering her residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One through Four. *Walters,* 127 F.3d at 529. The burden shifts to the Commissioner at Step Five to establish whether the claimant has the residual functional capacity to perform available work in the national economy. *Id.* The ALJ considers the claimant's residual functional capacity, age, education, and past work experience to determine if the claimant could perform other work. *Id.* Only if a claimant satisfies each element of the analysis, including inability to do other work, and meets the duration requirements, is she determined to be disabled. 20 C.F.R. §§ 404.1520(b)-(f) & 416.920(b)-(f); *see also Walters*, 127 F.3d at 529.

## DISCUSSION

Plaintiff raises a single assignment of error: that the ALJ erred in evaluating Plaintiff's pain and other symptoms. Specifically, Plaintiff argues the ALJ erred in discounting Plaintiff's testimony regarding her fatigue and the use of her hands. The Commissioner responds that the ALJ's RFC determination—including his assessment of Plaintiff's credibility—was not error, is supported by substantial evidence, and should be affirmed.

<u>Credibility / Subjective Symptom Reports</u>

The Sixth Circuit has long recognized, "pain alone, if the result of a medical impairment, may be severe enough to constitute disability." *King v. Heckler*, 742 F.2d 968, 974 (6th Cir. 1984); *see also Grecol v. Halter*, 46 F. App'x 773, 775 (6th Cir. 2002). As the relevant Social Security regulations make clear, however, a claimant's "statements about [his] pain or other symptoms will not alone establish that [he is] disabled." 20 C.F.R. § 404.1529(a); *see also Walters*, 127 F.3d at 131; *Hash v. Comm'r of Soc. Sec.*, 309 F. App'x 981, 989 (6th Cir. 2009).

A claimant's assertions of disabling pain and limitation are evaluated under the following standard:

> First, we examine whether there is objective medical evidence of an underlying medical condition. If there is, we then examine: (1) whether objective medical evidence confirms the severity of the alleged pain arising from the condition; or (2) whether the objectively established medical condition is of such a severity that it can reasonably be expected to produce the alleged disabling pain.

*Walters*, 127 F.3d at 531 (citations omitted). In determining whether a claimant has disabling pain, the regulations require an ALJ to consider certain factors including: 1) daily activities; 2) location, duration, frequency, and intensity of pain or symptoms; 3) precipitating and aggravating factors; 4) the type, dosage, effectiveness, and side effects of any medication; 5) treatment, other than medication, to relieve pain; 6) any measures used to relieve pain; and 7) other factors concerning functional limitations and restrictions due to pain or other symptoms. 20 C.F.R. § 404.1529(c); SSR 96-7p, 1996 WL 374186, at *3 ("20 CFR 404.1529(c) . . . describe[s] the kinds of evidence, including the factors below, that the adjudicator must consider in addition to the objective medical evidence when assessing the credibility of an individual's statements").[6] Although the ALJ must

---

6. Subsequent to the date of the ALJ's decision, the Social Security Administration issued new Social Security Ruling 16-3p, which supersedes Social Security Ruling 96-7p. The Sixth Circuit characterized SSR 16-3p as merely eliminating "the use of the word 'credibility' . . . to 'clarify

"consider" the listed factors, there is no requirement that the ALJ discuss every factor. *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 287 (6th Cir. 2009).

In this respect, it is recognized that the ALJ's credibility assessment "must be accorded great weight and deference." *Workman v. Comm'r of Soc. Sec.*, 105 F. App'x 794, 801 (6th Cir. 2004 (citing *Walters*, 127 F.3d at 531); *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 536 (6th Cir. 2001) (quoting *Myers v. Richardson*, 471 F.2d 1265, 1267 (6th Cir. 1972) ("[i]t [i]s for the [Commissioner] and his examiner, as the fact-finders, to pass upon the credibility of the witnesses and weigh and evaluate their testimony")). An ALJ may discount a claimant's credibility where the ALJ "finds contradictions among the medical records, claimant's testimony, and other evidence." *Walters*, 127 F.3d at 531. An ALJ's finding that a claimant's subjective allegations are not fully supported is a finding that should not be lightly disregarded. *See Varley v. Sec'y of Health & Human Servs.*, 820 F.2d 777, 780 (6th Cir. 1987); *see also Smith v. Halter*, 307 F.3d 377, 379 (6th Cir. 2001) (Court "may not disturb" an ALJ's credibility determination "absent [a] compelling reason"). Nevertheless, an ALJ's decision to discount a claimant's credibility "must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." SSR 96-7p, 1996 WL 374186, at *2.

The ALJ here cited the appropriate regulations and standard for evaluating subjective symptom statements (Tr. 69), and later explained:

---

that the subjective symptoms evaluation is not an examination of an individual's character.'" *Dooley v. Comm'r of Soc. Sec.*, 656 F. App'x 113, 119 n.1 (6th Cir. 2016). The Social Security Administration has stated SSR 16-3p is not to be applied retroactively. 82 Fed. Reg. 49462, 49468 n.27 (Oct. 25, 2017), available at https://www.gpo.gov/fdsys/pkg/FR-2017-10-25/pdf/2017-23143.pdf.

After careful consideration of the evidence, I find that the claimant's medically determinable impairments could reasonably be expected to cause some of the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible for the reasons explained in this decision.

(Tr. 70). After summarizing the medical evidence of record—including the opinion evidence—the ALJ then summarized:

I have carefully considered the claimant's statements concerning her impairments and their impact on the ability to perform work activity, and finds the allegations are considerably broader than is established by the medical evidence. This is not to say that the claimant was symptom free, or did not experience difficulty performing some tasks. However, the objective evidence does not demonstrate the existence of limitations of such severity as to have precluded her from performing all work on a regular and continuing basis at any time from the alleged onset date of disability. Objective records show that although the claimant had reduced grip strength, she had normal range of motion and intact strength in the upper and lower extremities. She alleged use of a wheelchair, but this is not supported by treating physician's notes, with no prescription or mention of ambulatory aids. Her gait was normal on examinations. (*See:* Ex. 5F; 9F). Records show reported improvement of her symptoms with medication and treatment (*See:* Ex. 17F). She attended vocational rehabilitation classes and successfully completed two computer courses in Microsoft certification. In addition, the onset, nature, intensity, and duration of symptoms, as well as precipitating and aggravating factors, have all been factored into the residual functional capacity assessment set forth herein for this claimant (SSR 96-7p).

(Tr. 73). Having carefully reviewed the record, the undersigned finds the ALJ's credibility determination supported by substantial evidence.

First, although Plaintiff objects to the ALJ's statement that "the objective evidence does not demonstrate the existence of limitations of such severity as to have precluded her from performing all work on a regular and continuing basis at any time from the alleged onset date of disability" (Tr. 73), the ALJ's decision supports this finding. Plaintiff is correct that the ALJ may not reject statements regarding pain and symptoms "solely because the available objective medical evidence does not substantiate [a claimant's] statements." 20 C.F.R. § 404.1529(c)(2). *See* Doc. 15, at 15). However, it is one factor that may be considered. *See* SSR 96–7p, 1996 WL 374186, at

*6 ("A report of negative findings from the application of medically acceptable clinical and laboratory diagnostic techniques is one of the many factors that appropriately are to be considered in the overall assessment of credibility."). The ALJ summarized medical records showing, e.g., "joint deformity, atrophy, and grip weakness in the hands, although she was able to extend and spread her fingers and could abduct and adduct her thumbs", normal reflexes, normal gait, and no muscle spasm. *See* Tr. 70 (citing Tr. 421-24). Plaintiff also had normal range of motion and 4/5 strength in her upper and lower extremities. *See id.* (citing Tr. 439). And, the ALJ noted, "[a]t an orthopedic follow up in February of 2015, she was noted to have normal gait, with no tenderness to palpation and normal range of motion" and "Heberden's and Bouchard's nodes . . . at the fingers bilaterally, but strength was intact". (Tr. 71) (citing Tr. 461). The ALJ also noted Plaintiff's subsequent examinations with Dr. Morrow showed similar physical findings. (Tr. 71) (citing Tr. 642, 647). Thus, the ALJ accurately pointed to objective medical evidence suggesting Plaintiff was less limited than she alleged. This finding is supported by substantial evidence. And, as discussed further below, this was not the only factor considered by the ALJ in assessing Plaintiff's credibility, therefore it was not error.[7]

Next, the ALJ relied upon "reported improvement of her symptoms with medication and treatment" (Tr. 73), citing Dr. Morrow's April and June 2015 treatment records (Tr. 640-48). In these records, Dr. Morrow stated Plaintiff had some improvement on Orencia (Tr. 642, 647), and that Plaintiff's "disease and pain [was] mostly well controlled." (Tr. 648). Additionally, earlier in his decision, the ALJ discussed Dr. Morrow's earlier notes that Plaintiff's pain and disease were

---

7. Moreover, while Plaintiff cites the objective evidence to show she "has an objectively well-documented rheumatoid arthritis", the ALJ here notably did not find there was not objective evidence to support Plaintiff's condition. Rather, he found that Plaintiff's impairments "could reasonably be expected to cause some of the alleged symptoms", but that her statements about "the intensity, persistence and limiting effects of these symptoms" were not entirely credible. (Tr. 70).

well-controlled. *See* Tr. 70 (citing Tr. 465) (December 2014 treatment note that "disease and pain are mostly well controlled"). The ALJ also noted that "[p]hysical therapy notes indicated decreased pain as well." (Tr. 70) (citing Tr. 555, 571 (November and December 2014 physical therapy treatment notes in which Plaintiff reported "pain ha[d] decreased")); *see also* Tr. 70 (citing Tr. 519, 523, 525) (November 2014, March 2015, and April 2015 physical therapy notes)). Plaintiff objects to the ALJ's citations to the physical therapy records, noting that "[o]ther than referencing three visits in 2015 where Ms. Fee indicated she felt better and she was gaining strength, he makes no mention of the extent of treatment, that is, 77 therapy sessions overall." (Doc. 15, at 16). The undersigned, however, has reviewed all of the physical therapy records and finds they simply provide further support for the ALJ's statement that Plaintiff's symptoms improved with treatment. Plaintiff attended physical therapy from November 2014 through April 2015, and treatment notes repeatedly show Plaintiff reporting decreased pain, *see* Tr. 543, 545, 547, 549, 551, 553, 555, 557, 559, 561, 563, 567, 569, 571, 575, a good response to treatment, and making progress toward her goals, *see* Tr. 581, 571, 561, 553, 551, 547, 541, 535, 533, 527, 519. In the final note in the record, from April 2015, it was noted Plaintiff: made 90% progress toward her goal of being able to demonstrate correct posture during activities; made 75% progress toward decreased pain to 0 "on FACES scale"; 85% progress toward gait with no deviation or antalgic pattern; 50% progress toward active range of motion and strength within functional limits to allow daily activity completion without pain; 85% progress toward no palpable tenderness; and 80% progress toward independence with a home exercise program. (Tr. 519). Thus, the ALJ did not err in relying on improvement in response to treatment as a factor detracting from Plaintiff's credibility. *See* 20 C.F.R. § 404.1527(c)(3)(v) ("Treatment, other than medication, you receive, or have received for relief of your pain or other symptoms."); *see also* SSR 96-7p, 1996 WL 374186, at *3; *Rice v.*

*Astrue*, 2012 WL 95433, at *4 (S.D. Ohio) ("treatment records reflecting improvement over time" is a "legitimate factor[] for the ALJ to consider" in assessing credibility).[8]

As the ALJ pointed out, although Plaintiff alleged she needed wheelchair to travel long distances, "this is not supported by treating physician's notes, with no prescription or mention of ambulatory aids." (Tr. 73). This sort of inconsistency between Plaintiff's testimony and the record is a valid reason for partially discounting Plaintiff's subjective statements about the extent of her fatigue and limitations. *See Kalmbach v. Comm'r of Soc. Sec.*, 409 F. App'x 852, 863 (6th Cir. 2011) ("Consistency between a claimant's symptom complaints and the other evidence in the record tends to support the credibility of the claimant, while inconsistency, although not necessarily defeating, should have the opposite effect.").

Within her argument, Plaintiff also contends it was error for the ALJ to assign great weight to Dr. Smith's opinion without specifically noting Dr. Smith's notations of deformity in the hands and wrists, and muscle atrophy in the hands. (Doc. 15, at 19). Plaintiff contends this evidence, as well as later x-rays "are consistent with more limited use of the hands as testified to by [Plaintiff]." (Doc. 15, at 19). Dr. Smith's medical opinion was that Plaintiff could "likely perform a sedentary level work", but "due to findings of generalized muscle weakness and joint deformity, limiting repetitive, prolonged, and static postures and activities should be considered". (Tr. 425). First, to the extent Dr. Smith's opinion is inconsistent with the ALJ's RFC, an ALJ is not required to adopt every limitation opined by a physician, even one to which he assigns "great weight". *See Reeves*

_____

8. Moreover, Plaintiff contends the ALJ did not consider the record as a whole, and noted improvement, without recognizing that Plaintiff was still noted to have synovitis in her wrists and fingers, signs of active disease. (Doc. 15, at 16-17) (citing Tr. 642, 594, 601). This is not a case, however, where the ALJ ignored evidence in the record. The ALJ noted physical findings, but also cited records supporting his conclusion Plaintiff was less limited than she alleged. *See* Tr. 70-72.

*v. Comm'r of Soc. Sec.*, 618 F. App'x 267, 275 (6th Cir. 2015) ("Even where an ALJ provides 'great weight' to an opinion, there is no requirement that an ALJ adopt a state agency psychologist's opinions verbatim; nor is the ALJ required to adopt the state agency psychologist's limitations wholesale."). Next, as the Commissioner points out, Dr. Smith's opinion also contained a finding that Plaintiff's ability to grasp, pinch, manipulate, and perform fine coordination was "normal". (Tr. 426). And the ALJ here did impose some limitation on Plaintiff's ability to handle and finger—he limited Plaintiff to "frequent" handling and fingering. (Tr. 68). Thus, the undersigned finds no error with the ALJ's decision to partially discount Plaintiff's testimony about her hand limitations.

Finally, Plaintiff objects to the ALJ's consideration of her attendance at vocational rehabilitation. She contends that "[a]s to daily activities, the [ALJ] seemed particularly swayed by [Plaintiff's] successful completion of vocational rehabilitation classes" and that he "describes nothing about how [Plaintiff] took these classes." (Doc. 15, at 17). Having reviewed the ALJ's decision, the undersigned finds no error. First, the ALJ explicitly recognized Plaintiff's computer class "was for four hours per day, two days per week, and she moved around about every hour and a half." (Tr. 70). Next, when the ALJ later mentioned Plaintiff's vocational training, he did not imply, as Plaintiff contends, that her ability to attend these course was indicative of an ability to perform activities on a sustained basis. He simply mentioned her attendance (Tr. 70), and noted she had done well in the classes—receiving a high score in a keyboarding class, as well as certificates in both Excel and Word (Tr. 70-71). He also noted that "she was able to concentrate and complete tasks, and had no complaints of major pain or fatigue." (Tr. 71) (citing Tr. 657) ("As reported by Ms. Fee, stamina has increased, and she does not have any major pain or fatigue which would prevent her from finishing assigned tasks, which suggests further improvement[.]"). The

undersigned finds no error in the ALJ's consideration of this evidence. He did not, as Plaintiff asserts, rely on this evidence as showing Plaintiff was capable of full-time work, but merely relied on it to determine, in assessing Plaintiff's credibility, that she was less limited than she alleged.

Plaintiff also argues the ALJ erred by failing to mention her job coach's assessment that it was "unknown" whether Plaintiff could "sustain[] long term" her "stamina and manageable pain level." (Doc. 15, at 18). An ALJ can, however, consider all the evidence without mentioning each piece of evidence individually. *See Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006) ("[A]n ALJ can consider all evidence without directly addressing in his written decision every piece of evidence submitted by a party.") (internal quotations omitted). And this opinion from a job coach is neither a medical opinion, nor an assessment of Plaintiff's specific functional limitations. An ALJ is not required to assess a vague statement that it was "unknown" whether Plaintiff could sustain full time work.

Ultimately, Plaintiff's credibility argument reflects a different interpretation of the evidence. And Plaintiff certainly can point to evidence in the record suggesting she is more limited than found by the ALJ. However, even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the Court must affirm "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones*, 336 F.3d at 477. Taken as a whole, the undersigned concludes the ALJ cited several reasons for finding Plaintiff's subjective statements about her symptoms not entirely credible; those reasons touched on several required factors (including effectiveness of medication, other treatment, and other factors, 20 C.F.R. § 404.1529), and those reasons are supported by substantial evidence in the record. *See* SSR 96-7p, 1996 WL 374186, at *2 (decision to discount a claimant's credibility "must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently

specific to make clear to the individual and any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight.") Having found no "compelling reason" to disturb the ALJ's credibility determination, *Smith*, 307 F.3d at 379, the undersigned must affirm.

## CONCLUSION

Following review of the arguments presented, the record, and the applicable law, the undersigned finds the Commissioner's decision denying SSI and CIB supported by substantial evidence and affirms that decision.


 s/James R. Knepp II
United States Magistrate Judge